## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )  CRIMINAL NO. 24-00026-KD-2 |
| | ) |
| ZACHARY HEATON THAGGARD | ) |

### PLEA AGREEMENT

The defendant, **ZACHARY HEATON THAGGARD**, represented by his counsel, and the

United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the

Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.  The defendant understands his rights as follows:

    a.  To be represented by an attorney;

    b.  To plead not guilty;

    c.  To have a trial by an impartial jury;

    d.  To confront and cross-examine witnesses and to call witnesses and produce

        other evidence in his defense; and

    e.  To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.  The defendant waives rights b through e, listed above, and pleads guilty to Counts

    One and Two of the Indictment, charging violations of Title 21, United States Code,

    Sections 846 (Conspiracy to Possess with Intent to Distribute Fentanyl) and

    841(a)(1) (Possession with Intent to Distribute Fentanyl), respectively.

1

3.    The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.    The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.    The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing that will follow.

6.    The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charges that have been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offenses.

7.    The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charges beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charges. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8.    A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that

2

the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.   This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court will impose. The defendant is pleading guilty because he is guilty.

10.  The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.  The maximum penalty the Court could impose as to each of Counts One and Two of the Indictment is:

 a.   Life imprisonment, with a mandatory minimum sentence of ten (10) years' imprisonment;

 b.   A fine not to exceed $10,000,000;

 c.   A term of supervised release of life with a mandatory minimum supervised release term of five (5) years. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

3

d.      A mandatory special assessment of $100.00; and

e.      Such restitution as may be ordered by the Court.

## SENTENCING

12.    The Court will impose the sentence in this case. The United States Sentencing Guidelines are advisory and do not bind the Court. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.    The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.    The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

4

15.    Both the defendant and the United States are free to allocute fully at the time of sentencing.

16.    The defendant agrees to tender $200.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessment in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## FORFEITURE

17.    The defendant agrees to forfeit to the United States any right, title, and interest in all assets subject to forfeiture under the notice of forfeiture contained in the charging document, including property specified in any bill of particulars and property previously seized by the government for administrative, civil, or criminal forfeiture. The defendant further consents to the filing of a motion for a preliminary order forfeiting such property and any dollar amount specified in the notice of forfeiture or bill of particulars, and the defendant confesses the requisite nexus between the property and the charge of the conviction. The defendant hereby withdraws any petition for remission or claim for such property for such property and further waives any right to contest or appeal the government's forfeiture proceedings for any reason, including on grounds that the forfeiture constitutes an unconstitutionally excessive fine or punishment, and in any manner, including by claim, petition, appeal or collateral attack.

## FINANCIAL OBLIGATIONS

18.     The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit

report in order to evaluate the defendant's ability to satisfy any financial obligation

imposed by the Court. In order to facilitate the collection of financial obligations to

be imposed in connection with this prosecution, the defendant agrees to disclose

fully all assets in which the defendant has any interest or over which the defendant

exercises control, directly or indirectly, including those held by a spouse, nominee

or other third party.

## UNITED STATES' OBLIGATIONS

19.     The United States will not bring any additional charges against the defendant

related to the facts underlying the Indictment and will move to dismiss any

remaining charges against the defendant once sentence is imposed in this case. This

agreement is limited to the United States Attorney's Office for the Southern District

of Alabama and does not bind any other federal, state, or local prosecuting

authorities.

20.     The United States will recommend to the Court that the defendant be sentenced at

the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF USSG § 5K1.1 AND/OR FED. R. CRIM. P. 35

21.     The defendant understands and agrees that he has no right to cooperate, and that

the decision whether to allow him to cooperate is reserved solely to the

United States in the exercise of its discretion. If the United States agrees to allow

the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

a.   The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offenses with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

b.   The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.   The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any

7

grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.     If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.     The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.     The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.     If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise

8

of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false

information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1)    permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)    permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i.    Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his

10

cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j.    The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

22.    As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence in any district court or appellate court proceedings.

a.    **EXCEPTIONS.** The defendant reserves the right to timely file a direct appeal challenging:

(1)    any sentence imposed in excess of the statutory maximum;

11

        (2)     any sentence which constitutes an upward departure or variance from the advisory guideline range.

    The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

23.    If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

24.    The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

25.    If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## VIOLATION OF AGREEMENT

26.    The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant. In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge. In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

27.    In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he

violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

### ENTIRETY OF AGREEMENT

28.     This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: March 30, 2024

Justin D. Roller
Assistant United States Attorney

Date: 4-1-2024

Kasee S. Heisterhagen
Assistant United States Attorney
Deputy Chief, Criminal Division

I have consulted with my counsel and fully understand all my rights with respect to the offenses charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 4-11-24

Zachary Heaton Thaggard
Defendant

I am the attorney for the defendant. I have fully explained his rights to him with respect to the offenses charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 4-11-24

Jan Jones
Attorney for Defendant

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 24-00026-KD-2 |
| | ) | |
| ZACHARY HEATON THAGGARD | ) | |

## FACTUAL RESUME

The defendant, **ZACHARY HEATON THAGGARD** ("THAGGARD"), admits the allegations of Counts One and Two of the Indictment.

## ELEMENTS OF THE OFFENSE

**THAGGARD** understands that in order to prove a violation of Title 21, United States Code, Section 846, as charged in Count One of the Indictment, the United States must prove:

First:  Two or more people in some way agreed to try to accomplish a shared and unlawful plan, the object of which was to possess with intent to distribute fentanyl; and

Second: The defendant knew the unlawful purpose of the plan and willfully joined in it.

**THAGGARD** further understands that in order to prove a violation of Title 21, United States Code, Section 841(a)(1), as charged in Count Two of the Indictment, the United States must prove:

First:  The defendant knowingly possessed fentanyl; and

Second: The defendant intended to distribute the fentanyl.

## OFFENSE CONDUCT

**THAGGARD** admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the

1

Court in determining whether a factual basis exists for **THAGGARD's** plea of guilty. The statement of facts does not contain each and every fact known to **THAGGARD** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement. All dates, times, amounts, and locations referenced below are approximations.

## Overview

From at least October 2023 to November 18, 2023, in the Southern District of Alabama and elsewhere, **THAGGARD** knowingly and intentionally conspired with codefendant James Walker Stewart ("Stewart") and with other persons, both known and unknown, to knowingly and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, a schedule II controlled substance. Additionally, as described more fully below, on November 18, 2023, **THAGGARD** knowingly and intentionally possessed with intent to distribute 498.1 grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl, a schedule II controlled substance. The quantity of mixture and substance containing a detectable amount of fentanyl attributable to **THAGGARD** in the conspiracy and involved in the possession offense exceeded 400 grams; thus, **THAGGARD** acknowledges that he is subject to the penalty provisions of Title 21, United States Code, Section 841(b)(1)(A).

## Controlled purchases of narcotics from Stewart & GPS phone ping

From late October 2023 into early November 2023, narcotics agents used a confidential source (the "CS") to make three controlled purchases of methamphetamine ice from Stewart in Baldwin County, Alabama. During each controlled purchase, the CS contacted Stewart via his cell

2

phone number, x2686. On November 7, 2023, narcotics agents obtained a warrant to collect GPS ping data on Stewart's T-Mobile cell phone.

### Nov. 2023: Stewart and THAGGARD travel to Atlanta, Georgia to pick up fentanyl and are arrested with it in Escambia County, Alabama

Between November 7, 2023 and November 16, 2023, agents monitored Stewart's GPS location using data provided by T-Mobile. On November 16, 2023, agents noticed the phone's location traveled from Baldwin County to the Birmingham, Alabama area before ultimately traveling to the Atlanta, Georgia area. The phone then traveled from Atlanta back to Birmingham before stopping at the Wind Creek Resort and Casino in Wetumpka, Alabama. While en route from Birmingham to Wetumpka, agents identified Stewart as the passenger of a white Infiniti G37, which **THAGGARD** was driving.

Between November 16, 2023, and November 17, 2023, agents continued monitoring Stewart's and **THAGGARD's** location via the cell phone ping data provided by T-Mobile. At 4:00 pm on November 17, 2023, agents noted that the phone traveled back to the Atlanta area, and then at around 8:00 pm, it began traveling back south towards Montgomery, Alabama, via Interstate 85.

At about 1:00 am on November 18, 2023, covert surveillance agents saw **THAGGARD's** Infiniti G37 parked in the parking lot of a Chevron gas station on Highway 21 in Atmore, near the Wind Creek Casino. Agents identified Stewart as the passenger and **THAGGARD** as the driver. Agents watched the defendants buy fuel and then drive to the parking lot of the nearby casino, where they met with a white Mercedes SUV. The occupants of both vehicles briefly spoke before departing the area, heading south on Highway 21.

At about 2:00 am on November 18, 2023, a sheriff's deputy saw **THAGGARD's** Infiniti G37 drift over the white fog line on the right-hand lane of Highway 21, leading the deputy

3

to conduct a traffic stop of the vehicle on Highway 21 near Woods Road. Upon approaching the car, the deputy asked **THAGGARD** why he had swerved on the road. **THAGGARD** told the deputy that he was turning down the air conditioning in the car. The deputy asked **THAGGARD** if he had consumed any alcohol that night, and **THAGGARD** replied that he had not. While questioning **THAGGARD**, the deputy noticed that **THAGGARD** seemed nervous—*i.e.,* he refused to make eye contact, was sweating despite the air conditioning running in the car, and his hands were shaking.

The deputy had **THAGGARD** step out of the car and come to a patrol car while verifying **THAGGARD's** information for a traffic infraction warning. While running **THAGGARD's** information, the deputy asked **THAGGARD** if he had ever been in trouble. **THAGGARD** said he had been arrested for possession of illegal drugs. The deputy then asked if there was anything illegal inside the Infiniti, to which **THAGGARD** responded no. The deputy noticed a change in **THAGGARD's** body language as he answered that question, as **THAGGARD** was constantly rubbing his forehead and breathing heavily. The deputy asked **THAGGARD** for consent to search the Infiniti, which **THAGGARD** denied.

At that point, the deputy immediately deployed his trained narcotics-detection K9 to conduct a free-air sniff around the Infiniti. The dog alerted on the rear passenger door of the car. At that time, the deputy and assisting officers on-scene removed Stewart from the front passenger's seat of the car and began a search, which was captured on body-camera video. As agents got Stewart out of the car, he noted that he and **THAGGARD** were being trailed by a white Mercedes SUV full of "dealers," and acknowledged that they had been traveling on a drug pickup for those individuals.

4

Agents searched the car. In the front passenger door, agents found a small plastic baggie containing a small amount of suspected methamphetamine ice. Chemical analysis by the Drug Enforcement Administration's ("DEA") Southeast Laboratory in Miami, Florida, confirmed that the substance was 2.207 grams of 98% pure methamphetamine hydrochloride. In the passenger floorboard, agents found two syringes filled with unknown liquid inside a pencil box. Agents found a grinder containing suspected marijuana shavings in the passenger door. And on the floorboard behind the driver's seat, agents found a vacuum-sealed, clear bag containing several large chunks of a white substance that agents believed to be cocaine. In fact, chemical analysis by the DEA's Southeast Laboratory confirmed that the substance was 498.1 grams of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as fentanyl.

**THAGGARD's post-*Miranda* confession**

Following the defendants' arrests, agents conducted post-*Miranda* interviews with each of them at the Escambia County Jail. The defendants each signed written *Miranda* waiver forms, and each also signed forms consenting to the search of their cell phones. Stewart had an iPhone and a Samsung cell phone. **THAGGARD** had a Motorola cell phone.

During his interview, **THAGGARD** said that on November 16, 2023, he had been contacted via text message by Stewart, who offered to pay for gas if **THAGGARD** would drive up to Birmingham and bring him back to Baldwin County. **THAGGARD** agreed to do so, met Stewart at a hotel room in Birmingham, used drugs with him, and departed for Baldwin County. **THAGGARD** said that during the trip, Stewart received a phone call that **THAGGARD** surmised involved was a drug deal that had gone awry. During the call, Stewart asked **THAGGARD** to drive to the Wind Creek Casino in Wetumpka, Alabama, and offered him $300 to drive him to Atlanta, which **THAGGARD** accepted.

5

**THAGGARD** said he and Stewart gambled at the Wind Creek Casino for about four hours before meeting up with several individuals in a white Mercedes SUV in the nearby parking lot of McDonald's. **THAGGARD** said one of the individuals got into his car and the three of them left for Atlanta with the white Mercedes following them. **THAGGARD** said that upon their arrival to the Atlanta area, they waited at a Dollar General store for about 45 minutes before a dark-colored BMW SUV pulled into the parking lot. **THAGGARD** said Stewart got out of the car and got into the BMW before returning to **THAGGARD's** car holding a gray, plastic grocery bag. **THAGGARD** said the unknown individual who was still sitting in the back seat of the Infiniti inspected the contents of the bag before getting out and getting back into the white Mercedes SUV trail vehicle.

**THAGGARD** said he and Stewart then left the Dollar General and drove south with the white Mercedes SUV following. **THAGGARD** and Stewart stopped for gas near the Wind Creek Casino in Atmore, Alabama, before meeting with the unknown individuals in the white Mercedes SUV in the parking lot of the casino. There, Stewart spoke briefly with one of the males who asked that they continue to Pensacola, Florida. **THAGGARD** said he pulled out of the parking lot and was stopped by police shortly thereafter. **THAGGARD** said that upon being stopped by police, Stewart told him that they were "going to prison for life." **THAGGARD** said he asked Stewart why, and Stewart responded that there was "a lot of fentanyl in the car." **THAGGARD** admitted that he knew the trip to and from Atlanta was to transport drugs. **THAGGARD** also admitted that he understood the drugs were being transported for the subjects in the white Mercedes SUV.

**Cell phone evidence**

**THAGGARD's** Motorola cell phone contained evidence linking him to drug-dealing activity and Stewart, who was saved in **THAGGARD's** phone under two different contacts.

6

**THAGGARD's admission of elements & enhanced penalties**

As part of his guilty plea in this case, **THAGGARD** admits that (1) two or more people in some way agreed to try to accomplish a shared and unlawful plan, the object of which was to possess with intent to distribute more than 400 grams of fentanyl; and (2) **THAGGARD** knew the unlawful purpose of the plan and willfully joined in it. **THAGGARD** further admits that he (1) knowingly possessed more than 400 grams of fentanyl and (2) intended to distribute the fentanyl. **THAGGARD** further agrees that his Motorola cell phone, referenced in the forfeiture notice of the Indictment and this Factual Resume, is to be forfeited to the United States.

AGREED TO AND SIGNED.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

Date: March 30, 2024

Justin D. Roller
Assistant United States Attorney

Date: 4-1-2024

Kasee S. Heisterhagen
Assistant United States Attorney
Deputy Chief, Criminal Division

Date: 4-11-24

Zachary Heaton Thaggard
Defendant

Date: 4·11·24

Jan Jones
Attorney for Defendant

7